UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Yvonne Lynn Vesey,

              Plaintiff,        Civil Action No. 11-10967

       vs.              District Judge Marianne O. Battani

Commissioner of           Magistrate Judge Mona K. Majzoub
Social Security,

           Defendant.
_____/

## Report and Recommendation

Plaintiff Yvonne Lynn Vesey seeks judicial review of Defendant the Commissioner of Society Security's determination that she is not entitled to social security for her mental and physical impairments for the period between September 3, 2004 and December 31, 2007. (Dkt. 1.) 42 U.S.C. § 405(g), 42 U.S.C. § 1383(c). Before the Court are the parties' motions for summary judgment. (Dkt. 11, 14.)

The Court has been referred these motions for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt. 2, 16.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation.[1]

## I.    Recommendation

Because the Court recommends finding that the ALJ failed to provide a narrative discussion of how the evidence supported her ultimate RFC, the Court recommends granting in part Plaintiff's

_____

[1]The Court dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

1

motion, denying Defendant's motion, and remanding this matter.

## II.     Report

### A.     Facts

#### 1.     Procedural facts

On April 9, 2007, Plaintiff filed for disability and disability insurance benefits, alleging disability beginning in July, 2001.  (AR at 21.)  Her claim was denied.  She requested a hearing, which was held on September 11, 2009.  (*Id.*)  On March 23, 2010 the ALJ denied Plaintiff's disability requests.  (*Id*. at 18.)  The ALJ concluded that Plaintiff was not disabled from September 3, 2004 through December 31, 2007 within the meaning of the Social Security Act.[2]  On January 11, 2011 the Appeals Council denied Plaintiff's request for review a second time.  (AR at 1.)  On March 11, 2011 Plaintiff filed this case, seeking judicial review of Defendant's denial.  (Dkt. 1.)

#### 2.     Record evidence

The record is replete with medical evidence that falls outside of the relevant time period. The Court chronologically reviews the evidence that the parties rely upon in their briefs, although the majority of that evidence does fall outside of the relevant time period.

Some of the earliest records that Plaintiff points to discuss grinding in her shoulders (January 2003), radiculitis/degenerative disc disease in her back (May 2003) and her alleged carpal tunnel (May 2002).[3]  (AR at 206, 204, 205.)

---

[2]The ALJ notes that Plaintiff had filed an earlier disability request, alleging disability on July 29, 2001.  (AR at 21.)  The ALJ found that a prior ALJ denied Plaintiff's first request and that there was no regulatory basis for reopening the September, 2004 final decision.  (*Id.*)

[3]Records exist, though, that suggest that Plaintiff did not have carpal tunnel: "[Plaintiff] states that she had an EMG done by Dr. Munson which showed that she had carpal tunnel, and this contradicts the EMGs that I have done.  She does have symptoms of pain in her right hand

2

In May 2003 Plaintiff saw Dr. Ciullo.  (AR at 249.)  He noted that Plaintiff had persistent pain, despite physical therapy.  (*Id.*)  He further noted that, although Plaintiff was supposed to have a CT/arthrogram performed, she waited seven months before she did so.  (*Id.*)  Dr. Ciullo further noted that Plaintiff was experiencing a "very loud grinding and pop from external rotation towards internal rotation" in her shoulder.  (*Id.*)  He also stated that she had an impingement.  (*Id.*)

Dr. Ciullo referred Plaintiff to another doctor to assess Plaintiff's joint pain.  (AR at 255.) That doctor stated that Plaintiff had osteoarthritic degenerative changes.  (*Id.*)

On May 4, 2004 Plaintiff was referred to a Disability Examiner. (AR at 232.)  The referral shows that Dr. Forrer formed a poor opinion of Plaintiff's mental status.  He stated that "[h]er affect is blunted, very limited in range and mobility, grossly inappropriate to the circumstances of the moment and to her content of thought."  (AR at 235.)  He also stated that she was not well-oriented and that she "had no idea why she was being examined and didn't know how it had come about nor what its implication was."  (*Id.*)  Dr. Forrer found that Plaintiff's mental impairments had its "ups and downs" and reasoned that Plaintiff must have been doing better when she saw her prior psychiatrist.  (*Id.* at 236.)  Dr. Forrer concluded that "[Plaintiff was] not capable of returning to the work force in view of the findings above."  (*Id.*)

On May 13, 2004 Plaintiff had a psychological test performed.  (AR at 228.) The test was conducted to aid the Social Security Administration in determining Plaintiff's disability eligibility. (*Id.*)  The examiner noted that "[Plaintiff] did not put forth good effort during the examination today. Throughout the exam [Plaintiff] made statements like, "I can't do this," without much effort.  The

---

and wrist, with numbness, which she attributes to her neck problems, and a pinched nerve." (AR at 206).

following scores are a lowered estimation of her actual abilities." The examiner stressed again Plaintiff's "lack of motivation and effort throughout the examination." (*Id.* at 226.) The examiner estimated "that [her cognitive ability] is more likely to be functioning in the borderline range." (*Id.*) On the testing portion, the examiner stated "[Plaintiff] answered the [test] in such a way as to invalidate the test. She answered an unusually large number of extreme items in the deviant direction; an indiscriminate and exaggerated response pattern is probable." (*Id.* at 230.)

In the summer of 2005 Plaintiff went to the emergency room for swelling in her legs. (AR at 187.) The intake report noted that Plaintiff was tearful/depressed and was experiencing pain and swelling. (*Id.* at 188.) The ER report mentions that Plaintiff had a history of depression, sinus problems, and hypoglycemia. (*Id.*)

In July 2005 Plaintiff visited the Hurley Medical Center due to an alleged assault. (AR at 243.) In July 2006 Plaintiff visited the emergency room again, due to an alleged assault. (*Id.* at 297.)

A July 2006 radiology consultation shows that Plaintiff had "[m]ild to moderate arthritic/degenerative findings" in her bones. (AR at 307.)

On April 18, 2007 Plaintiff visited the McLaren Regional Medical Center emergency room, feeling anxious, tired, and experiencing a "fluttering' heartbeat. (AR at 258.)

On June 19, 2007 Bright Horizons Psych Center evaluated Plaintiff for the Disability Determination Service. (AR at 336.) The examiner noted that Plaintiff lived by herself, in an apartment, and that Plaintiff's main support was her AA group. (*Id.* at 337.) The examiner also noted that Plaintiff attended both her AA group and church regularly. (*Id.*) The examiner stated that Plaintiff was able to drive, clean, and had no problems with bathing or dressing. (*Id.* at 337-38.)

The examiner recounted that Plaintiff denied hallucinations and nightmares, although

4

Plaintiff had stated that she had "on and off again" suicidal thoughts.  (AR at 338.)  The examiner reported that Plaintiff expressed that she was depressed and anxious and that she snapped at people.  (*Id.*)  The examiner also reported that Plaintiff began having panic attacks six months prior, and that Plaintiff was experiencing the attacks daily.  (*Id.*)

The examiner noted that Plaintiff was oriented times three.  (AR at 338.)  The examiner diagnosed Plaintiff with major depressive disorder, recurrent and moderate; panic disorder, cluster C personality traits; carpal tunnel; and social and occupational problems.  (*Id*. at 339.)

Plaintiff's psychiatric review, a mental residual functional capacity assessment, performed on July 9, 2007 by Dr. Thomas T.L. Tsai, shows that Dr. Tsai found that Plaintiff had mild restrictions of daily living, moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (AR at 354.)  Dr. Tsai also found that Plaintiff's symptoms did not satisfy the Paragraph C criteria.  (*Id*. at 355.)  Dr. Tsai concluded, in the functional capacity assessment, that Plaintiff would be able to do unskilled work, despite having moderate impairments.  (*Id*. at 360.)

A physical RFC is not in the record.

From 2004-2007 Plaintiff saw Dr. J.T. Aills, a psychiatrist.  (AR at 510-530.)  In these records, Plaintiff reported having various amounts of stress, panic attacks, and other issues.  (*Id.*)

An October 5, 2009 Session Note from Genesys Hillside Center for Behavioral Services shows that, although Plaintiff was still exhibiting the symptoms she had when she arrived, she was progressing well.  (AR at 547.)  The note shows that Plaintiff "continues to exhibit appropriate motivation for further pursuit of treatment goals and objections."  (*Id.*)  The note also shows that

"[Plaintiff] appears to have formed positive initial rapport and seems committed to the pursuit of psychiatric intervention." (*Id.*)

### 3.    The ALJ hearing

#### a.    Plaintiff's testimony

On September 11, 2009 Plaintiff appeared at her hearing. (AR at 34.) Plaintiff testified that her neck, hand, and arm prevented her from working. (*Id.* at 41.) She stated that she could only stand for a half of an hour at a time. (*Id.*) She added that she was able to walk, but that she no longer walked long distances–because she became out of breath. (*Id.*) She testified that she was able to sit, but not for long. (*Id.*)

She stated that she could lift three pounds. (AR at 42.) She added that she had trouble using her hands, and that she had more trouble with her right hand than with her left hand. (*Id.*) She stated that her ability to reach was affected, because reaching bothered her neck. (*Id.* at 42-43.) She acknowledged that she did not have any problems with bending at the waist, bending her knees, or crouching down. (*Id.*) She added that she had no problems with ascending or descending stairs, save for getting tired. (*Id.*)

As for household duties, Plaintiff stated that she did not cook, clean, or do laundry, but only because she "[didn't] feel like [doing them.]" (AR at 43.) Plaintiff stated that she "sometimes" went shopping for groceries, but usually with a friend. (*Id.*) The reason she did not go frequently, she expressed, was because she "[didn't] have the patience" to do the shopping. (*Id.*)

She stated that she did not visit relatives or friends or have any other type of social contact. (AR at 43.) As a hobby, she stated that she enjoyed walking, but that she could not walk anymore. (*Id.* at 44.) She added that she was unable to do yard work. (*Id.*) She stated that she did not have

any problems taking care of herself–washing, etc.  (*Id.*)  And she stated that she drove sometimes, but that someone usually went with her.  (*Id.*)  But she explained that she did not take trips beyond seventy-five miles.  (*Id.* at 44-45.)

At the hearing, Plaintiff also discussed her substance abuse addiction and treatment.  (AR at 48-49.)

When her attorney questioned her, Plaintiff responded that she sometimes had problems gripping things, opening jars, and buttoning.  (AR at 51.)  Her attorney also asked her about her ability to concentrate while watching a movie.  Plaintiff responded that she was not able to finish the movie and that she had trouble following the movie's plot.  (*Id.* at 51-52.)  Plaintiff also answered "yes" to her attorney's question of whether she had mood swings.  (*Id.* at 52.)  Plaintiff explained that she cried and experienced fear and nervous feelings.  (*Id.*)  These feelings caused her to shake, she stated.  (*Id.* at 53.)  She explained that she did not experience panic attacks as she had in the past, but that she still experienced depression and anxiety.  (*Id.*)

Plaintiff also explained to her attorney that she had anger control problems–that she snapped at people frequently.  (AR at 54.)  These anger control issues, she stated, led her to have problems with her supervisors.  (*Id.*)

Plaintiff's attorney then questioned Plaintiff about the ALJ's questions to Plaintiff about self-care.  (AR at 54.)  Plaintiff responded that she was not able to take care of herself "all [of] the time" and that she experienced days when she was not able to get out of the bed and did not get dressed or shower all day.  (*Id.*)  She stated that she experienced these types of days up to three times per week.  (*Id.*)

Plaintiff also added that she had irregular sleep.  (AR at 55.)

7

Plaintiff also stated that her condition had gotten worse since 2004. (AR at 56.) Plaintiff explained that she felt isolated, but that she wanted to be around people. (*Id.*) When she went around people, she stated that she felt embarrassed, as if she would say something wrong, or she felt as if she was going to cry. (*Id.* at 57.) She stated that her physical condition changed–when she walked, her leg ached and she ended up limping. (*Id.*) But she stated that she did not have a physical examination. (*Id.*) She stated that she just felt more tired. (*Id.*)

### b. Disability report

Plaintiff filled out a disability report for her request for benefits. (AR at 137.) Plaintiff stated that her depression, pinched neck nerve, carpal tunnel, hypoglycemia, tendinitis, sinusitis, and anxiety limited her ability to work. (*Id.* at 138.) These ailments, Plaintiff stated, limited her ability by causing her to have problems with her hands and her ability to concentrate. (*Id.*)

When Plaintiff was interviewed about this report, the interviewer noted that Plaintiff had problems understanding, concentration, and answering questions. (AR at 148.) The interviewer observed that "[Plaintiff] seemed very confused and coul[d] not answer questions with exact information–etc dates she was married and when she went to her medical sources." (*Id.*).

On her function report, Plaintiff reported that she had difficulty sleeping and that her anxiety caused her to have these sleeping problems. (AR at 150-51.) She stated that she was able to mostly care for her herself–bathing, dressing, care for her hair (or have someone else do it). (*Id.* at 151.) She added that she prepared food for herself, daily, although that preparation took two to three hours. (*Id.* at 152.) She stated that she watered her flowers and did some of her laundry. (*Id.*) She added that these activities also took her three hours to complete. (*Id.*) And she stated that she had some help with these activities. (*Id.*) She stated that she did not do house or yard work sometimes,

because she could not concentrate on exactly what she was doing.  (*Id.* at 153.)

Plaintiff stated that she was able to get around by driving a car or using public transportation. (AR at 153.) She further stated that she was able to go out alone.  (*Id.*)

Plaintiff also stated that she was able to handle her finances: paying bills, counting change, and handling a savings account.  (AR at 153.)

For hobbies, Plaintiff stated that she enjoyed watching TV and walking, although she expressed that her interest in those activities had decreased in the last couple of years.  (AR at 154.) As for social interaction, Plaintiff stated that she "sometimes" went out with others and that she regularly went to church.  (*Id.*)  She did mention that she has problems getting along with others: "anger, bitter, blaming."  (*Id*. at 155.)

Plaintiff checked boxes that her alleged disability limited: lifting; bending; reaching; seeing; concentration; following instructions; and using her hand.  (AR at 155.)  Although Plaintiff did not describe "how" these limitations affected her and caused her to be disabled.  (*Id.*)

She stated that she could not walk a mile and that she needed twenty minutes to rest before she moved after walking.  (AR at 155.)

As to concentration, she stated that she was not able to follow written directions well and that she followed spoken directions "ok."  (AR at 155.)  She admitted that she had a hard time adjusting to changes in routine.  (*Id*. at 156.)  She added that she felt afraid of being alone at times and that sometimes she was afraid of being around people.  (*Id.*)

### c.      Vocational expert testimony

The ALJ asked the VE if jobs existed in the economy for a person:

who cannot lift, carry, push or pull more than five pounds frequently, and no more than 15 pounds occasionally.  And I want to modify that by saying

> pushing and pulling should never be more than occasional. Assume a person
> who can stand up to six hours in an eight-hour work day and sit up to eight
> hours in an eight-hour work day with typical breaks and a lunch period.
>
> This person should not have to climb ladders, and occasionally climb stairs,
> and occasionally stoop, occasionally crouch. Assume a person limited to
> frequent handling, fingering and feeling. The person should not do forceful
> or sustained gripping or grasping, should not need to reach above shoulder
> level, and reaching in other directions is limited to frequent.
>
> There should be no exposure to hazards or to vibration. Assume a person
> limited to work that's simple and routine. Instructions should not be detailed.
> The work should not require extended periods of concentration. There should
> be no more than occasional changes in work settings or procedures. Only
> occasional interaction with supervisors.

(AR at 58-59.) The VE stated that a person with those limitations could not perform Plaintiff's past

relevant work. (*Id*. at 59.) But the VE stated that jobs existed in the economy for someone who did

have that RFC. (*Id*. at 60.) The ALJ further limited the RFC to someone who did not need to deal

with the general public. (*Id.*) With that limitation, the VE stated that jobs still existed in the

economy. (*Id.*) And if a sedentary limitation was imposed, the VE stated that, even then, jobs

existed that Plaintiff could perform. (*Id.* at 60-61.) And even if a limitation requiring a job in which

a person would be able to leave her neck in a neutral position for two-thirds of the day, the VE

testified that jobs still remained. (*Id*. at 61.) These jobs, the VE stated, did require a person to be

able to work five days a week for eight hours a day. (*Id.*)

Plaintiff's attorney asked the VE whether a person who could not concentrate for more than

twenty to thirty minutes at a time, and not stay on task, could perform all the jobs the VE listed. (AR

at 64.) The VE stated that, if Plaintiff was unable to complete the tasks assigned, on a regular basis,

at least seventy-five per cent of the tasks assigned, Plaintiff could not perform the jobs listed. (*Id.*)

### 4. The ALJ's ruling

On March 23, 2010 the ALJ issued her opinion denying Plaintiff's benefits request.  (AR at 18.)  In her ruling, the ALJ found that Plaintiff had the following severe impairments: affective disorder; anxiety-related disorder; personality disorder; substance addiction disorder; degenerative joint disease, carpal tunnel syndrome; and degenerative disc disease.  (*Id*. at 23.)

The ALJ began her analysis by noting that Plaintiff had a history of shoulder pain since 1994.  (AR at 23.)  She noted Plaintiff's visits with Dr. J. Ciullo, in November 7, 2000 and Dr. P. Musson, in September 20, 2001.  (*Id.*)  The ALJ stated that Plaintiff reported that she had pinched a nerve in her neck.  (*Id.*)  From this pinched nerve, the ALJ noted that Dr. Awerbuch, a neurologist, placed Plaintiff on sick leave.  (*Id.*)  The ALJ reviewed that Plaintiff reported having back, right shoulder, and right upper arm pain.  (*Id.*)    The ALJ stated that the possible diagnoses included degenerative joint disease with radiculopathy and reactive depression.  (*Id.*)  The ALJ found that the records also showed that, in December 28, 2001, Plaintiff was attending physical therapy three days a week.  (*Id.* at 24.)  The ALJ then noted that Plaintiff underwent electromyography, which resulted in a carpal tunnel diagnosis.  (*Id.*)  An MRI revealed, the ALJ stated, mild spondylosis and a discogenic disease, without a focal cervical herniated nucleus pulposus or spinal stenosis.  (*Id.*)  The ALJ then noted that, in May 2003, Dr. Ciullo ordered a CT/arthrogram after Plaintiff completed a physical therapy program, which Plaintiff stated did not help.  (*Id.*)  After the test was performed, the ALJ noted that Dr. Cuillo found minimal changes in Plaintiff's condition and prescribed another round of physical therapy for Plaintiff.  (*Id.*)

The ALJ continued through Plaintiff's medical history.  She noted that, in July 2005, Plaintiff went to the emergency room because her legs had swollen.  (AR at 24.)  The ALJ noted that, at the July 2005 visit, the records showed that Plaintiff was tearful and acknowledged depression.  (*Id.*)

11

Those records showed that Plaintiff was taking Klonopin. (*Id.*) The records also showed that tests showed that Plaintiff had been using cocaine. (*Id.*) The records finally showed that Plaintiff was discharged with diuretics and instructions, and that Plaintiff's condition was "good" (*Id.*)

The ALJ reviewed a July 2006 incident where Plaintiff stated she was assaulted. (AR at 24.) The ALJ noted that Plaintiff reported that she had right shoulder pain from having been struck in the right arm and chest. (*Id.*) The records, the ALJ stated, showed that Plaintiff did have some discoloration over that area. (*Id.*) The records, the ALJ stated, showed that Plaintiff was experiencing pain and limited movement. (*Id.*) But the ALJ noted that Plaintiff had no other complaints and that an x-ray showed no acute fracture or gross malalignment. (*Id.*) The records also showed that Plaintiff was told to use ice and heat as needed and to take Motrin, if needed. (*Id.*)

The ALJ reviewed June 2007 records. The ALJ stated that these records showed that Plaintiff had stopped working due to stress and neck injuries. (AR at 24.) The records show that Plaintiff stated that she was experiencing right-sided carpal tunnel syndrome, anxiety, and depression. (*Id.*) The records further show that Plaintiff claimed that she had been seeing a psychiatrist for approximately six years and was seeing a somewhat helpful therapist. (*Id.*) The ALJ stated that Plaintiff had been taking Buspar, Paxil, and Xanax. (*Id.*) The ALJ also stated that Plaintiff reported having intermittent problems with crack cocaine, but had not used cocaine for about one year. (*Id.*) The ALJ noted that Plaintiff stated that she had been feeling depressed and anxious and that she could sometimes snap at people. (*Id.*) The ALJ stated that Plaintiff reported panic attacks and that she had been diagnosed with depressive disorder, panic disorder, and cocaine dependence in partial sustained remission. (*Id.*) The ALJ reported that Plaintiff's Global Assessment of Functioning was 58. (*Id.*)

The ALJ reviewed Plaintiff's August 2007 hospital incident.  (AR at 25.)  The ALJ stated that Plaintiff reported using crack cocaine and that she thought she was poisoned.  (*Id.*)  The ALJ also noted that Plaintiff reported that she was not taking her Klonopin, and that she denied taking any other medications.  (*Id.*)  The ALJ stated that Plaintiff reported depression and anxiety.  (*Id.*)  And the ALJ further stated that the records showed that Plaintiff was treated with Ativan and discharged with instructions to stop using cocaine.  (*Id.*)

The ALJ briefly noted that Plaintiff had dropped out of her therapy treatment in the beginning of 2009, although she had been having good response to treatment in 2008.  (AR at 25.)

The ALJ then noted several operations and issues she had post-December 2007.  (AR at 25-26.)  The ALJ discussed how these issues did not cause any impairment until ten months after Plaintiff's date of last insured.  (*Id*. at 26.)

The ALJ concluded that Plaintiff's musculoskeletal impairments were not of the severity to satisfy Listings 1.02 and 1.04.  The ALJ reasoned that Plaintiff's impairments were not characterized by gross anatomical deformities.  (AR at 26.)  The ALJ stated that the imaging studies and degenerative changes had not resulted in a compromise of the nerve root or the spinal cord.  (*Id.*)

The ALJ also concluded that Plaintiff's mental impairments were not "attended by the findings necessary to meet or equal Listing[s] 12.04, 12.06, 12.08, or 12.09."  (AR at 26.)  The ALJ listed the four criteria of Paragraph B of the Listings and found that Plaintiff had mild restrictions of activities in daily living attributable to the mental impairment; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no extended episodes of decompensation.  (*Id.*)  The ALJ held that Plaintiff's symptoms

13

did not "establish the presence of the "C" criteria for purposes of Listing 12.04." (*Id.*)  The ALJ stated that she based this determination on the state agency consultant/mental health professional "who determined that [Plaintiff] had no more than moderate functional limitations from the medically determinable mental impairments[.]" (*Id*. at 25-26.)

The ALJ then calculated Plaintiff's RFC.  She found that Plaintiff had the RFC to perform light work with the following limitations: lifting/carrying five pounds frequently and fifteen pounds occasionally, with no more than occasional pushing and pulling; standing/walking up to six hours per eight-hour workday, with typical breaks, sitting up to six hours per eight-hour workday, with typical breaks; no climbing of ladders; occasionally climbing of stairs, stooping and crouching; no exposure to hazards or vibration; no forceful or sustained gripping or grasping; frequent handling, fingering, and feeling; no reaching above shoulder level and no more than frequent reaching in other directions; and no work that involved more than occasional flexing, extending, and rotating the neck. Plaintiff could perform simple, routine, work tasks with no detailed instructions and no more than occasional changes in work settings or procedures.  She could not perform work that involved dealing with the general public for extended periods of time, or more than occasional interaction with supervisors.  (AR at 27.)

The ALJ then reviewed Plaintiff's hearing testimony and ultimately concluded that she did not credit her statements about her impairments' intensity, persistence, or functionally limiting effects of pain or other symptoms.  (AR at 28.)  The ALJ stated that Plaintiff testified that her neck, hand, and arm symptoms prevented her from working.  (*Id.*)  The ALJ added that Plaintiff stated that she was able to stand for about thirty minutes.  (*Id.*)  And the ALJ recounted that Plaintiff stated that she could not walk long distances and was not able to sit for too long before standing up.  (*Id.*)  The

14

ALJ stated that Plaintiff testified that she had trouble using her hands and that she could not reach up.  (*Id.*)  The ALJ recounted that Plaintiff was able to take care of her personal needs and that she was able to shop for groceries and drive, sometimes.  (*Id.*)  The ALJ reviewed the medications Plaintiff stated she took.  (*Id.*)

The ALJ reviewed Plaintiff's alleged mental impairments.  (AR at 28.)  She found that Plaintiff stated that she has mood swings and problems with anger control.  (*Id.*)  She recounted that Plaintiff mentioned that she had days, up to three times per week, when her depression was so bad that she did not get out of her bed or shower–she also stated that she cries, at times, and isolated herself.  (*Id.*)  The ALJ also stated that Plaintiff testified that she cannot sleep at night and that she napped during the day, sometimes for two hours.  (*Id.*)

The ALJ then explained that she found that Plaintiff's impairments could cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects were not credible.  (AR at 28.)  The ALJ reasoned that Dr. Ciullo's 2003 CT/arthrogram showed only minimal changes.  (*Id.*)  The ALJ stated that the records showed that no surgery was required, and only physical therapy was prescribed.  (*Id.*)  The ALJ further noted that an MRI of the cervical spine showed only mild spondylosis and discogenic disease, but that there was no focal herniation or spinal stenosis.  (*Id.*)

The ALJ discussed Plaintiff's mental impairments.  (AR at 28-29.)  The ALJ stated that Plaintiff, in 2007, received inpatient substance addiction treatment.  (*Id*. at 28.)  The ALJ noted that the records showed that Plaintiff had "a partial to good response to treatment."  (*Id*. at 29.)  The ALJ pointed out that a July 2009 intake assessment showed that Plaintiff had not seen her treating physician in two years.  (*Id.*)  The ALJ noted that there was no "reference in the treatment records

15

. . . of the significant adverse medication side effects [Plaintiff] described at the hearing." (*Id.*)  The ALJ added that "[t]he medical records through the date last insured also do not support the alleged need to nap for two hours per day, or refer to an inability to get out [of] bed approximately three days per week."  (*Id.*)

The ALJ stated that he assigned substantial weight to the state agency medical consultant's opinion of Plaintiff's mental RFC through December 31, 2007.  (AR at 29.)  The ALJ noted that the record did not contain an RFC of Plaintiff's physical condition.  (*Id.*)

The ALJ then discussed her conversation with the VE concerning Plaintiff's capability to perform other jobs in the economy. (AR at 29-30.)  After that discussion, the ALJ directed a "not-disabled" finding.  (AR at 30.)

## C.    Standards

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.   Judicial review under this statute is limited to determining whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner's decision employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases, resolve conflicts in the evidence or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

16

In determining the existence of substantial evidence, the Court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 1.       Framework for social security disability determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

1.  he was not presently engaged in substantial gainful employment; and

2.  he suffered from a severe impairment; and

3.  the impairment met or was medically equal to a "listed impairment;" or

4.  he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the

Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987) (citation omitted). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### D.    Analysis

Plaintiff argues that the ALJ improperly evaluated both her physical and mental impairments and therefore calculated an improper RFC. The Court first notes that, as the ALJ points out in her opinion, Plaintiff's prior RFC that was used to deny Plaintiff her 2001-2004 disability benefits request binds the ALJ for later RFC calculations, unless Plaintiff proves that her condition has worsened since the date of that RFC. *See Drummond v. Comm'r*, 126 F.3d 837, 842 (6th Cir. 1997) ("Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."). "[W]hen a claimant has been previously adjudicated 'not disabled,' she bears the burden of proving that her condition has worsened since the date of the prior decision such that she is no longer capable of engaging in substantial gainful activity." *Webb v. Astrue*, 11-023, 2011 WL 4431108, at *4 (E.D.Tenn. Sept. 22, 2011) (citing *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1232 (6th Cir. 1993) (holding that the plaintiff had to "show by clear and convincing evidence that she was disabled" during the relevant period and stating, "when a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity.").

On September 2, 2004 Plaintiff received her first unfavorable disability benefits decision.

(AR at 69.)  There, that ALJ determined that Plaintiff was not disabled from 2001 until the date of

decision, September 2, 2004.  That ALJ crafted an RFC for Plaintiff:

> In this instance, the record as a whole establishes that no period of 12 consecutive months elapsed during which the claimant lacked the [RFC] to perform light work as defined in 20 CFR § 404.1567 that involves lifting and carrying up to 15 pounds with the right hand, only occasionally (up to 33%) pushing and pulling with the right arm, occasional bending at the waist, no reaching overhead with the right arm, no forceful or sustained gripping or grasping with the right hand, no use of vibrating hand tools, no prolonged or constant rotation, flexion or hyperextension of the neck, no detailed instruction, no extended periods of concentration. [O]ccasional changes in the work setting or procedures, and only occasional interaction with supervisors.

(AR at 76.)[4]

    For the relevant period, here, the ALJ found that objective evidence existed that Plaintiff's

condition had changed.  The ALJ found that Plaintiff had the RFC to perform light work with the

following limitations:

> lifting/carrying five pounds frequently and fifteen pounds occasionally, with no more than occasional pushing and pulling; standing/walking up to six hours per eight-hour workday, with typical breaks, sitting up to six hours per eight-hour workday, with typical breaks; no climbing of ladders; occasionally climbing of stairs, stooping and crouching; no exposure to hazards or vibration; no forceful or sustained gripping or grasping; frequent handling, fingering, and feeling; no reaching above shoulder level and no more than frequent reaching in other directions; and no work that involved more than occasional flexing, extending, and rotating the neck.  Plaintiff could perform simple, routine, work tasks with no detailed instructions and no more than occasional changes in work settings or procedures.  She could not perform work that involved dealing with the general public for extended periods of time, or more than occasional interaction with supervisors.

 (AR at 27.)

    Plaintiff's current RFC  is more detailed and restrictive than Plaintiff's prior RFC.

### 1.    The Court recommends remanding because the ALJ failed to explain the

---

    [4]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weight up to 10 pounds[.]"  20 CFR § 404.1567.

**connection between the evidence and her RFC of Plaintiff**

The Court recommends remanding this matter–the ALJ has not explained how she calculated Plaintiff's RFC. This failure, the Court recommends finding, requires remand.

The ALJ stated that the record contained "some objective medical documentation of change in [Plaintiff's] condition since September 2, 2004." (AR at 27.) The ALJ added that she was not precluded from calculating the new RFC given Plaintiff's new testimony and evidence bearing on her condition. (*Id.*) Tthe ALJ did calculate a new, more restrictive RFC, both with regards to Plaintiff's physical and mental capability assessments. And so the Court would expect some sort of explanation as to how and why the ALJ reached a new conclusion with respect to Plaintiff's limitations–in fact, case law and Social Security rulings require such an explanation.

Social Security Ruling 96-8p provides, in relevant part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (July 2, 1996).

Courts in this district and circuit have held that the ALJ's failure to link the evidence to ultimate RFC: "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Meyer v. Comm'r*, 10-12963, 2011 WL 3440152 (E.D.Mich. June 9, 2011) (citation omitted) (Michelson, Mag. J.) *adopted by* 2011 WL 3471411

20

(E.D.Mich. Aug. 8, 2011) (Borman, J.) (internal quotation marks and citations omitted). The *Meyer* court further found that it "may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the decision fails to provide an accurate and logical bridge between the evidence and the result." *Id*. (internal quotation marks and citation omitted). *See also Steadman v. Comm'r*, 10-801, 2011 WL 6415512 (S.D.Ohio Nov. 14, 2011). The *Steadman* court noted that it was "unable to discern from the ALJ's opinion how he arrived at the physical RFC decision and what evidence the ALJ relied on in making that decision. The ALJ failed to articulate the basis for his RFC opinion and to link his RFC determination with specific evidence in the record in accordance with Social Security Ruling 96-8p." *Id*. at *12. The court noted,

> the record is devoid of any physician opinions on plaintiff's physical functional capacity or limitations. Nor did the ALJ engage the services of a medical advisor at the hearing. Therefore, there is no medical opinion on plaintiff's functional limitations. . . . Significantly, the ALJ's decision fails to include a narrative explanation describing how the medical evidence of record supports the specific exertional limitations set forth in the ALJ's RFC finding . . . . Although the ALJ did discuss plaintiff's statements of limitations as well as the medical evidence related to plaintiff's back impairment and treatment therefor . . . the ALJ failed to take the next step and explain how such evidence signified an ability to perform light work. Simply listing the medical and other evidence contained in the record and setting forth an RFC conclusion without linking such evidence to the functional limitations ultimately imposed in the RFC is insufficient to meet the "narrative discussion" requirement of SSR 96-8.

*Id*. at *12. The court concluded that "[t]he ALJ was required to cite some substantial medical and other evidence in the record to support his findings on plaintiff's ability to lift, carry, sit, stand, and walk, and not fashion an RFC out of whole cloth." *Id*. at *13.

Here, the Court recommends finding that the ALJ did not provide a reasoning for her RFC in accordance with SSR 96-8p. The ALJ limited Plaintiff's former RFC, but did not explain why.

While the ALJ did present a thorough recitation of the record evidence, she did not provide

a narrative discussion on how the evidence signified Plaintiff's ability. The Court is at a loss as to how the ALJ reached her RFC. That failure requires remand.

While Defendant does argue that substantial evidence supports the ultimate RFC, whether that argument is true is not the issue. The issue is whether the ALJ explained the RFC. And here, she did not. Had the ALJ explained her RFC, the Court would have been able to conduct a meaningful review. The ALJ's failure to give a narrative description of how the evidence supported the RFC therefore requires remand.

### D.   Conclusion

Because the ALJ failed to present a connection between her RFC and the evidence of record, the Court recommends granting in part Plaintiff's motion for summary judgment, denying Defendant's motion for summary judgment, and therefore remanding this case pursuant to Sentence Four of § 405(g) for further proceedings consistent with this report and recommendation. On remand, the ALJ should reconsider Plaintiff's RFC and give a narrative description that complies with SSR 96-8p.

## III.   Notice to Parties Regarding Objections

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v.*

*Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc. Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than ten days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated:  August 6, 2012                s/ Mona K. Majzoub
                                      MONA K. MAJZOUB
                                      UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated:  August 6, 2012                s/ Lisa C. Bartlett
                                      Case Manager